IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IGOR BENIOT CASTANG,

    **Plaintiff,**

**v.**

KATHERINE JEONG-EUN KIM,

    **Defendant.**

CIVIL ACTION FILE

No. 1:22-CV-05136-SCJ

## ORDER

This matter appears before the Court following a two-day bench trial on Plaintiff's petition under the Hague Convention for wrongful removal.[1] Doc. No. [88]. After hearing the evidence presented and the arguments made by the Parties in this matter, the Court issues the following findings of fact and conclusions of law. Ultimately, the Court concludes that Plaintiff has shown that the Child was wrongfully removed from the Child's habitual residence in France

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

in violation of Plaintiff's custodial rights. Accordingly, Plaintiff's petition is **GRANTED**. The Child is hereby **ORDERED** to be returned to France in compliance with the instructions in this Order.

## I.     BACKGROUND

Plaintiff filed this case against Defendant on December 30, 2022. Doc. No. [1]. Plaintiff alleged that Defendant violated the Hague Convention on the Civil Aspects of International Child Abduction, as codified in the United States under the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9001, et seq. Id. at 1. The Court, per ICARA's requirements, set an expedited schedule for the case. Doc. No. [11]. Ultimately, the Court held a two-day bench trial on February 3, 2023, and February 6, 2023. Doc. Nos. [81]; [88]. At trial, the Court heard testimony from a number of witnesses, including Plaintiff, Defendant, an expert on French law, and several friends and family members of the Parties. The Court further heard argument by the Parties as to why each should prevail under ICARA. The Court, having considered the evidence and arguments, now makes the following findings of fact and conclusions of law.

## II.    FINDINGS OF FACT

It is undisputed that Plaintiff is the Child's father and that Defendant is the Child's mother. In 2014, Plaintiff and Defendant met in Atlanta, Georgia and began a romantic relationship. In 2017, Defendant became pregnant with the Child. In March 2018, the Parties decided to relocate to France — where Plaintiff was from and where his family resided. The Child was born in France in July 2018. The Child is a dual French and American citizen by virtue of parentage, and is bilingual, speaking both French and English. From the Child's birth — that is, for the last four-years — both Parties and the Child resided in France, traveling only occasionally to the United States to visit Defendant's family. The Child is now four-years old.

Following the Child's birth, Plaintiff and Defendant's relationship began to deteriorate and eventually the Parties ended their romantic relationship. Defendant, however, continued to reside in France, as did the Child. In September 2021, the Parties sought a custody order from a French court.[2] On

---

[2] For the exhibits entered into evidence at the bench trial that also appear on the Court's docket will be referred to by their docket number. For the exhibits that do not readily show a docket number, the Court refers to these exhibits by their trial exhibit number (*e.g.*, Pl's Ex. No. [48]).

September 9, 2021, the French court entered the first custody order. Doc. No. [27-1]. This custody order granted joint parental authority to Plaintiff and Defendant. Defendant maintained primary custody of the Child, and Plaintiff had extensive visitation rights. The order further required the Parties jointly to make major decisions such as "schooling and career guidance, religion, health, [and] authorization to practice dangerous sports."[3] Id. at 3. The September 9, 2021 Order anticipated a possibility that Defendant and the Child would move to the United States. Id. This first custody order was operative, and seemingly effective, for several months, in part because the Parties had reconciled their relationship and were on positive terms.

Following further breakdown of the relationship (including physical[4] and verbal threats by Defendant against Plaintiff and his family to remove the Child from France and sever Plaintiff's relationship with the Child), Plaintiff initiated a

---

[3] While Defendant makes much over the first custody order not including the Child's residence as an example of a major decision that required joint agreement, the Court finds that the second custody order cures any such omission by ordering the exit ban over the Child.

[4] One incident occurred on April 8, 2022 when Defendant came to Plaintiff's mother's house, and used a screwdriver to break the glass door of the home. Plaintiff called the police, and a report was made of the incident.

second custody proceeding. The French court thereafter issued a second custody order on May 17, 2022, which—despite Defendant's behavior—maintained the first order's determinations on joint parental authority and Defendant's primary custody rights. Doc. No. [27-4], 2–3. The second order, however, also critically imposed a "ban on the [C]hild leaving French territory without the authorization of both parents." Id. at 3.

In addition to the second order's exit ban, Plaintiff also obtained a temporary (15-day) travel ban on May 6, 2022, and a permanent travel ban from the Montpellier Court of Law on May 31, 2022. Doc. Nos. [27-2]; [27-3]. The permanent ban further specified parental authorization required a "declaration [be] made in a police station . . . at least five days before the departure." Doc. No. [27-3], 1. Despite these bans, Defendant once attempted to leave France with the Child and was stopped at the border.

In early June 2022, Defendant successfully removed the Child from France and came to the United States. Defendant circumvented the travel ban by first driving to Spain and then flying from Spain to the United States. Plaintiff discovered that Defendant and the Child were missing when he went to

Defendant's residence to pick up the Child and only found Defendant's dog and Defendant's left behind belongings.

Defendant claims and submits evidence that Plaintiff knew and gave consent (in email and over the phone) for her departure with the Child to the United States. Plaintiff does not dispute that he offered to pay for the plane tickets and to domesticate the French custody orders in the United States but contends that Defendant mocked and rejected these offers. When Defendant did depart from France, however, Plaintiff sent an email message stating,

> I guess you are on the move again. It was bound to happen, wasn't it ;-)? The only thing I hope you grasped if that you need to leave from a non [F]rench airport, otherwise you are going to get blocked again . . . ps: I still think it's a terrible idea but ok.

Doc. No. [27-10]. Defendant responded, "[Y]ou really thought I was stupid enough to try and leave from a French airport huh. you're stupid for underestimating me. Spain is only a three hour car trip Igor. I would have taken the train but Border Police as well. The world doesn't revolve around France . . . ." Doc. No. [27-10]. While Plaintiff acknowledged that this email message could be construed as giving consent for the Child to be removed from

6

France, he maintains the message was sent out of distress and was not serious, but misplaced sarcasm.

In the United States, Defendant and the Child initially stayed with Defendant's father. Defendant's father, however—who Defendant testifies suffers from mental health problems—eventually kicked Defendant and the Child out of his house. Defendant then turned to Plaintiff for financial assistance in the United States. Even with financial assistance from Plaintiff, Defendant struggled to find living arrangements, though there is some evidence she was eventually able to find an apartment. See Pl's Exs. Nos. [48]; [50]. In the interim, Defendant and the Child lived in several Airbnbs, all paid for by Plaintiff. Defendant did not secure employment while she was in the United States. She did indicate however that she had found a Montessori school for the Child. See Pl's Ex. No. [50].

Plaintiff traveled to the United States on July 19, 2022, where he found Defendant and reconnected with the Child. In early August 2022, however, Plaintiff took the Child back to France. Again, the Parties dispute if Defendant consented to Plaintiff taking the Child. Defendant maintains she was opposed to moving back to France with the Child, whereas Plaintiff submitted an email

message from Defendant that stated, "I am not completely against France" and that she was "ok" with Plaintiff purchasing her and the Child a house in France. See Pl's Exs. Nos. [48], [50].

In August 2022, Defendant rejoined Plaintiff and the Child in France. Defendant stayed in Paris and traveled to South Korea to visit her grandmother, and so the Child primarily remained in Plaintiff's care. Defendant however contends that Plaintiff withheld the Child from her between August 2022 and November 2022. While in France from August 2022 and November 2022, Plaintiff and the Child lived with Plaintiff's mother in a guest house. During this time, the Child was enrolled in a French school (Doc. No. [27-6]) — to which Defendant had given written consent (Doc. No. [1-15]), though Defendant maintains that her consent was given under duress. Plaintiff also initiated a third child custody proceeding in France in August 2022, which is still pending, again seeking full custody of the Child.

On November 14, 2022, following an assembly for the Child, the Parties and the Child went to a café. While Plaintiff paid, Defendant took the Child, unbeknownst to Plaintiff, back to her residence (an Airbnb), and left again with the Child for the United States. This time, however, Defendant was not in

8

communication with Plaintiff, and he did not know the Child's whereabouts until December 2022. Once Plaintiff discovered the Child was in the United States, he initiated this ICARA suit for the return of the Child.

Plaintiff offered a number of character witnesses who testified about the closeness between Plaintiff and the Child. These witnesses were friends of Plaintiff and had children the same age as the Child. They had witnessed Plaintiff's role in taking the Child to and from school and activities, as well as caring and nurturing the Child. Many of the witnesses likewise indicated that the Child was close to Defendant, who also played a critical role in the Child's life. There is no doubt in the Court's estimation that both Parties are loving parents who genuinely wish to be part of the Child's life.

## III.   CONCLUSIONS OF LAW

The Court turns now to its conclusions of law. The Court first outlines the relevant legal standards, then resolves some preliminary issues as raised by the Parties' arguments in this case, and finally renders its conclusions regarding the habitual residence of the Child.

A.      **Legal Standards and Considerations**

Plaintiff brings this action under ICARA for Defendant's alleged wrongful removal of the Child, and seeks the return of the Child to France. See 22 U.S.C. § 9001(a)(4). Plaintiff must prove by a preponderance of the evidence the *prima facie* elements of a wrongful removal case. Id. § 9003(e)(1).

> [T]o establish a *prima facie* case of wrongful retention: (1) that [the child] "was a habitual resident of [another country] immediately before [the child's] retention in the United States"; (2) that [Defendant's] retention breached [Plaintiff's] custody rights under [the law of the habitual residence]; and (3) that [Plaintiff] "had been exercising [his] custody rights at the time of retention."

Berenguela-Alvarado v. Castanos, 950 F.3d 1352, 1358 (11th Cir. 2020) (quoting Chafin v. Chafin, 742 F.3d 934, 938 (11th Cir. 2013)).

Put somewhat differently, the Court must answer four questions,

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

Mozes v. Mozes, 239 F.3d 1067, 1070 (9th Cir. 2001), abrogated on other grounds by Monasky v. Taglieri, 140 S. Ct. 719 (2020).

10

What became evident during the Parties' presentation of the evidence is that the habitual residence determination is the essence of this case. While Plaintiff rejected a stipulation to this effect, the Court determines that *if* it finds the habitual residence of the Child is France, then Plaintiff has met his burden on the custodial elements—that is, he had rights of custody under French law and was exercising those rights at the time of the wrongful removal. In making this determination, the Court relies on the two French custody orders granting the Parties joint parental authority and requiring major decisions regarding the Child to be made jointly. The Court further finds the custody orders' visitation schedule—which allows Plaintiff extensive visitation: overnight weekly, many weekends, and holidays—is convincing evidence of Plaintiff's custodial rights over the Child. Not insignificantly, the mutual consent required to remove the Child from France in the exit ban alone has been determined by the Supreme Court to constitute rights of custody. Abbott v. Abbott, 560 U.S. 1, 15, (2010) ("[T]he joint right to determine [a] child's country of residence . . . is a right of custody under the Convention."). Thereby, these French legal arrangements are sufficient for the Court to determine that Plaintiff had rights of custody over the Child under French law.

11

Moreover, the Parties agree that Plaintiff exercised and was exercising his rights under the custody orders when the Child was removed from France — both in June 2022 and November 2022. Many witnesses testified to Plaintiff's closeness and responsibility with the Child. The Child moreover exclusively lived with Plaintiff for several long periods, including the three-months preceding Defendant's November 2022 removal of the Child from France. Thus, if France is determined to be the habitual residence of the Child, then the Court must conclude that Plaintiff has met his burden of proving his custody rights and his exercise thereof of the Child.

Habitual residence of the Child, however, is less clear, and thereby, it is the heart of this case. The Supreme Court's 2020 decision in Monasky v. Taglieri, 140 S. Ct. 719 (2020), adopted a totality of the circumstances standard for habitual residence and gave further guidance for determining whether the totality of the circumstances had been proven. Generally, Monasky declares the habitual residence inquiry is to be "fact-sensitive," and not "categorical." Id. at 726. Accordingly, "courts must be 'sensitive to the unique circumstances of the case and informed by common sense.'" Id. at 727 (quoting Redmond v. Redmond, 724 F.3d 729, 744 (7th Cir. 2013)). Indeed, "[n]o single fact . . . is dispositive across

12

all cases." Id.; see also id. at 728 ("The bottom line: There are no categorical requirements for establishing a child's habitual residence . . . .").

The Supreme Court's discussion emphasized particularly the age of the child and the ability of the child to "acclimate" to a particular place.[5] Id. at 727. Thus, for younger children, "the intentions and circumstances of caregiving parents are relevant considerations." Id. One such circumstance may appear when "an infant lived in a country only because a caregiving parent had been coerced into remaining there." Id. The Supreme Court specifically rejected an "actual agreement" requirement to determine habitual residence when the child is an infant. Id. at 728; see also id. ("An actual-agreement requirement would enable a parent, by withholding agreement, unilaterally to block any finding of

---

[5] The Court here reaffirms its understanding of the Child's age as expressed in the summary judgment order. See Doc. No. [73], 21 n.9 ("The child in this case is 4-years old, and thus is, practically speaking, in an age group above infancy. This difference, however, is immaterial, because a 4-year-old is closer to an infant than an adolescent child, who has the capacity to comprehend circumstances and express acclimation to an environment with clarity and reason—which was what the Supreme Court primarily relied upon in speaking on the role of infancy. See Monasky, 140 S. Ct. at 731–32 (Thomas, J., concurring in part) (describing the Majority's conclusion as resting on the fact that "an infant . . . is too young to acclimatize"). Thus, while the child's actual age is certainly a factor the Court considers, the Court also finds the Supreme Court's statements on infancy in Monasky to be informative and overall persuasive.").

habitual residence for an infant."). "But a wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'" Id. at 729.

Other facts that the Majority articulates as potentially relevant are "a change in geography combined with the passage of an appreciable period of time, age of the child, immigration status of child and parent, academic activities, social engagements, participation in sports programs and excursions, meaningful connections with the people and places in the child's new country, language proficiency, and location of personal belongings." Id. at 727 n.3 (quotations omitted) (citing Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 67–68 (2d ed. 2015)).

The concurring opinions in Monasky give further guidance on what facts might be relevant to the habitual residence determination. Both concurrences clearly agree with the Majority's conclusion that habitual residence is a totality of the circumstances inquiry. Id. at 732 (Thomas, J. concurring in part) ("I also agree with the Court's conclusion that the habitual-residence inquiry is intensely

14

fact driven, requiring courts to take account of the unique circumstances of each case."); id. at 734 (Alito, J. concurring in part) ("I agree . . . that analysis of the question of 'habitual residence' should be based on a range of factors and should be attentive to the particular facts of each case . . . .").

Justice Thomas lists facts that would assist in determining if a location is "habitual" — specifically, "the presence or absence of bank accounts and driver's licenses, the length and type of employment, and the strength and duration of other community ties." Id. at 733. For "residence," Thomas says courts might consider "the presence or absence of a permanent home, the duration in the country at issue, and, in some cases, an actual agreement between the parents to reside in a particular place." Id.

Justice Alito, for his part, acknowledges that "home" is both "the place where a person generally sleeps, eats, works, and engages in social and recreational activities" and "the place where a person feels most comfortable and the place to which the person has the strongest emotional ties." Id. at 734. Thus, Justice Alito would define habitual residence as "the place where the child in fact has been living for an extended period — unless that place was never regarded as

15

more than temporary or there is another place to which the child has a strong attachment." Id. at 734–35.

## B.  Preliminary Determinations

With these considerations in mind, the Court turns to the Parties' arguments and, foremost, the more novel propositions put forth in this case. First, throughout the trial, both Parties—but particularly Defendant—equated the Child's habitual residence with a *parent,* not a country or physical location. Defendant's primary argument is that, per the French custody orders, the habitual residence of the Child is with Defendant (*i.e.,* the mother). Accordingly, Defendant elicited a large amount of testimony about the Child feeling "at home" with Defendant, being most comfortable with Defendant, and having the strongest emotional ties to the Defendant. While certainly not Plaintiff's primary strategy, he responded to Defendant's tactic by likewise eliciting testimony about the Child's emotional connections to Plaintiff.

While the Court does not outright reject the testimony and evidence about the Child's emotional ties and feeling "at home" with the Parties, the Court determines for a number of reasons that it would be error to determine habitual residence in reference to a person instead of a country. Initially, the Court finds

no support in <u>Monasky</u> (or other cases) suggesting a Child's habitual residence could be determined in reference to a parent, not a country. <u>See</u>, <u>e.g.</u>, <u>Monasky</u>, 140 S. Ct. 719 (determining if the child's habitual residence was the United States or Italy); <u>Smith v. Smith</u>, 975 F.3d 558, 560 (5th Cir. 2020) (determining if the child's habitual residence was the United States or Argentina); <u>Berenguela-Alvarado v. Castanos</u>, 820 F. App'x 870, 871 (11th Cir. 2020) (determining if the child's habitual residence was the United States or Chile).

Furthermore, the term itself—habitual residence—mostly obviously refers to a physical location, not the care of or ties to another person. <u>Cf.</u> <u>Residence</u>, Black's Law Dictionary (11th Ed. 2019) (defining "residence" as "[t]he place where one actually lives" or "bodily presence plus an intention to make the place one's home" or "[a] house or other fixed abode"). Moreover, as an element of an ICARA claim, the habitual residence determination is made in part to determine the law used for assessing rights of custody and the exercise of those rights. The Court determines it would be odd indeed to determine a choice of law based on a person (*i.e.*, parent). It is more intuitive and appropriate for habitual residence to be determined based on a country (or geographic location) and that place's legal provisions be applied to the other elements.

Finally, if the Court were to adopt Defendant's theory that habitual residence can be determined based on a person (not just a place), the Court would be overly tangling a custody determination with a wrongful removal determination. To be sure, the totality of the circumstances inquiry endorsed by Monasky seemingly allows the Court to consider facts that might more often appear in a custody case (*e.g.*, emotional connections to community and people). The Court nevertheless is still mindful that its determination in this matter is limited to whether the removal of the child was wrongful under ICARA—it has no jurisdiction to make a custody decision. Barzilay v. Barzilay, 600 F.3d 912, 916–17 (8th Cir. 2010) ("The purpose of proceedings under the Hague Convention is thus not to establish or enforce custody rights, but only 'to provide for a reasoned determination of where jurisdiction over a custody dispute is properly placed.'" (quoting Barzilay v. Barzilay, 536 F.3d 844, 850 (8th Cir. 2008))). Confining the habitual residence determination to a country, not a person, thus reenforces these boundaries between ICARA petitions and domestic custody decisions.

Next, as a preliminary matter, the Court will address Defendant's argument that the third custody petition filed contains a certified translation of

18

the first two custody orders, which reads that "*habitual residence*" is to be set with Defendant. Doc. No. [1-14], 12, 14 (emphasis added). Defendant admits that the use of the term "habitual residence" as translated in these French custody orders cannot be outcome determinative, but argues that it is persuasive evidence of the habitual residence being set with Defendant. For the above reasons, however, the Court will not associate ICARA's habitual residence determination with a parent, but with a country (*i.e.*, the United States or France). Moreover, even if the translation is fair and accurate, it is contained in a domestic court order, which, as the Court already indicated in its summary judgment order, may not necessarily use the term "habitual residence" as anticipated by the Hague Convention and ICARA petitions. See Doc. No. [73], 23. Thus, under both the totality of circumstances inquiry and as a matter of legal interpretation, the Court does not find the third custody petition's translation of the previous custody orders to be dispositive or carry the significant weight that Defendant argues it deserves.

C.   **Habitual Residence of the Child**

As for the substance of the question presented, the Court must ultimately decide whether, at the time of the removal, the Child's habitual residence was

France or the United States. Defendant stipulates—and the Court agrees that the evidence supports—the Child's habitual residence was France prior to the June 2022 removal of the Child to the United States. Thus, there are two relevant time periods for the Court to consider in its habitual residence determination: (1) habitual residence following Defendant's June 2022 removal of the Child to the United States, and (2) habitual residence following Plaintiff's August 2022 removal of the Child to France.

> **1.** **Habitual Residence Following Defendant's June 2022 Removal of the Child to the United States**

The first determination the Court must make is whether Plaintiff proved by a preponderance of the evidence that the Child's habitual residence remained in France despite the Child residing in the United States from June 2022 until August 2022. The Court concludes that Plaintiff has met his burden.

First, it is not insignificant that the Child resided in France for most of the Child's life. Indeed, since birth, most of the Child's days have been spent in France. There is no doubt that the Child is at home in France, with his friends and extended family—many of whom testified to the Child's well-being and social engagement there. Cf. Monasky, 140 S. Ct. at 734–35 (Alito, J., concurring in part)

("[Habitual residence] means the place where the child in fact has been living for an extended period—unless that place was never regarded as more than temporary or there is another place to which the child has a strong attachment.").

The French custody orders also support that the Child's habitual residence remained France even after Defendant removed the Child to the United States. The operative second custody order specifically disallows the Child's removal from France without authorization from both parents. While the evidence shows that Plaintiff knew of and responded to Defendant's taking of the Child to the United States, the Court is disinclined to say that Plaintiff's June 7, 2022 email assented to Defendant taking the Child to the United States. In these email messages, Plaintiff specifically states that he believed Defendant's move "was bound to happen" and that he thought it was "a terrible idea but ok." Doc. No. [27-10]. The Court credits Defendant's explanation of this message—and his advice to Defendant to leave from a non-French airport—as being misplaced sarcasm and not serious consent to the Child being taken from France. Accordingly, Defendant's removal of the Child from France violate the French

court's exit ban, as it was not mutually made between the Parties.[6] Thus, while the Eleventh Circuit's old settled-intent test no longer is outcome determinative in determining habitual residence, the Court finds that, as a factor in the totality of the circumstances inquiry—and an enormously persuasive one here—both Parties did not intend for the Child to be moved to the United States. This finding, especially in conjunction with the French order requiring consent for the Child to travel, weighs heavily in favor of finding the Child's habitual residence remained in France.

Other factors likewise contribute to the Court's conclusion. First, Defendant came to the United States with the Child and did not establish any roots or community ties. Indeed, while Defendant indicates that her and the Child "were going to lease an apartment with my mom who didn't mind helping me financially," Defendant failed to secure long-term housing while in the

---

[6] The Court refuses to weigh against Defendant the failure to obtain authorization to travel with the Child in accordance with the procedures outlined in the May 31 permanent ban—which required going to a police station to give consent five-days before travel. Doc. No. [27-3]. The second custody order itself did not state specifically the manner of authorization required. Doc. No. [27-4]. Plaintiff offered no expert testimony that the more robust authorization requirement applied to the custody order as it is written, or evidence that Defendant was aware of the French civil code's requirements.

United States. <u>See</u> Pl's Ex. No. [48]. Defendant did not obtain, nor is there any evidence that she was seeking, employment. Defendant did not bring all of her and the Child's belongings to the United States. While Defendant's testimony was that she brought what she needed for her and the Child to start a life in the United States, the Court does not find that this explanation sufficient to weigh in favor of finding habitual residence in the United States. Defendant indicated that she had found a Montessori school for the Child to attend, but there is no evidence to support the feasibility of the Child's attendance or that steps had been taken to actually enroll the Child. [7] <u>See</u> Pl's Exs. Nos. [48]; [50]. Furthermore, while Defendant, and the Child had family in the United States, there is no evidence supporting that they established or were establishing further communal or relational ties.

---

[7]  The Child's age and the time frame at issue make the relevance of schooling questionable. While there is testimony that the Child went to a Montessori school in France prior to the June 2022 removal, the Child only turned 4-years old in July 2022. Thus, while approaching school-age, the Court is not convinced that Defendant's failure to enroll him in school in the United States for the 2022-23 school year is to be heavily weighed, as many children—especially with a caregiving parent able to stay at home—do not begin school until they are 5- or 6-years old. Moreover, the fact that Defendant had the Child in the United States during the summer months, where school would not be in session, further counsels against strongly counting against Defendant the failure to enroll the Child in school.

Finally, the Court considers the dynamics of the Parties' relationship in its June 2022 habitual residence determination. Both Parties admit that they had created a "toxic" and "roller coaster" of a relational environment. Thus, the Court cannot credibly find that Defendant had been coerced into staying in France. In fact, the first custody order expressly anticipated Defendant taking the Child to the United States and Defendant failed to do so before the second custody order amended this privilege. As far as the evidence shows, Defendant remained in France for four-years, mostly willingly and certainly without overt coercion to stay.

In sum, the aforementioned factors weigh in favor of finding that the habitual residence of the Child remained in France even following Defendant's June 2022 removal of the Child to the United States. Other than the Child's emotional ties to Defendant—which the Court already determined it would consider, but not afford dispositive weight—the Court has not been presented evidence to successfully counterweigh that the Child's habitual residence remained in France during this period. Thus, the Court concludes, as of June 2022, the habitual residence of the Child continued to be in France.

2.   *Habitual Residence Following Plaintiff's August 2022 Removal of the Child to France*

The Court now addresses whether any actions by the Parties during the time period between August 2022 and November 2022 ought to change the habitual residence of the Child being in France. The Court finds none. To the contrary, during this period there is more evidence that the Child's habitual residence was France. The Parties agreed to enroll the Child in a French school.[8] Some of Defendant's statements support that she did not object to the Child remaining in France after being brought back in August 2022. See Pl's Exs. Nos. [48] ("I am not completely against France . . . ."); [50] ("I was ok with [Plaintiff purchasing a home in France for Defendant and the Child]"). Plaintiff had an established home with his mother, and there is evidence of the Child's social and communal engagement in France.

One issue, however, is that Plaintiff did not seek legal remedy in bringing the Child back to France in August 2022. Thus, his use of self-help weighs against finding the Child's habitual residence in France following the "re-abduction."

---

[8] There is no evidence supporting Defendant's contention that Plaintiff coerced this agreement, and thus the Court does not credit it.

25

Ovalle v. Perez, 681 F. App'x 777, 783 (11th Cir. 2017) (determining that a parent who fails "to pursue [a] legal remedy" enables the child "to obtain a habitual residence in the country to which [the child was taken], even if the initial taking was wrongful." (quoting Kijowska v. Haines, 463 F.3d 583, 588–89 (7th Cir. 2006))). The Court, however, does not read Ovalle to *bar* finding habitual residence in the country where the Child was "re-abducted," but only that such re-abduction "weighs in favor" of a contrary habitual residence finding. Id. In this case, moreover, no other habitual residence finding may be made because the Court has already determined that habitual residence was not established in the United States between June 2022 and August 2022. While it certainly would have been more prudent for Plaintiff to seek legal remedy — and the Court does not condone Plaintiff's removal of the Child on his own volition — his actions in August 2022 ultimately do not prohibit finding that the Child's habitual residence remained in France despite the time spent in the United States from June 2022 until August 2022.

Accordingly, at the time of Defendant's November 2022 removal of the Child, the Child's habitual residence was France. As already discussed, supra at 11–12, Plaintiff met his burden to show custody rights and the exercise of those

rights under French law. Consequently, Plaintiff has proved by a preponderance of the evidence his *prima facie* case for wrongful removal under ICARA and Defendant has asserted no defense thereto. Plaintiff's petition must thereby be **GRANTED**.

## IV.    CONCLUSION

For the foregoing reasons, the Court thus **GRANTS** Plaintiff's petition and **ORDERS** the Child be returned to France. As far as the return of the Child is concerned, the Court **ORDERS** the following:

- The Court immediately places the physical custody of the Child with the Plaintiff. He shall be allowed to return the Child to France. Upon arrival in France, the Court acknowledges that the French custody orders from September 2021 and May 2022 will be operative, and nothing in this Order should be read as prohibiting the Parties from pursuing further custody rights or other domestic relief in the French courts.

- Plaintiff must provide Defendant an address, phone number, and other contact information through which Defendant can contact the Child.

- The earliest the Child can be removed to France is **5p.m., Monday, February 13, 2023**, and the Court will maintain custody of the Parties and

the Child's passports until then. The Parties should contact the Court to arrange a time to pick-up the passports. The Court orders this delay solely for the purpose of permitting Defendant to apply for an emergency stay pending appeal. If a stay is not granted by 5:00 p.m. on Monday, February 13, 2023, then the Child is allowed to be removed to France in accordance with this Order.

- If Plaintiff seeks expenses and legal fees under 22 U.S.C. § 9007(c), then Plaintiff must submit his brief in support by Friday, February 17, 2023. Defendant must file any response to the brief for fees and expenses by Friday, February 24, 2023. No reply will be permitted absent extraordinary circumstances.

**IT IS SO ORDERED** this ___9th___ day of February, 2023.

_____
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**